**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 11 C 4448 |
| FUNDS IN THE AMOUNT OF $239,400, | Judge James B. Zagel |
| Defendant, | |
| John Valdes and Tracey Brown, | |
| Claimants. | |

**MEMORANDUM OPINION AND ORDER**

This is an *in rem* civil forfeiture action brought by the United States pursuant to 21 U.S.C. § 881(a)(6), for forfeiture of funds in the amount of two hundred thirty-nine thousand four hundred dollars ($239,400). The Government alleges the funds were furnished in exchange for a controlled substance and were intended to be used to facilitate narcotics trafficking, in violation of 21 U.S.C. § 801, *et seq*.

Before the court is Claimants' motion to suppress evidence. For the following reasons, the motion is DENIED.

**I.    BACKGROUND**

This case arises out of an encounter between law enforcement officers assigned to the DEA Transportation Interdiction Group at Amtrak Union Station in Chicago, Illinois and Claimant John Valdes ("Valdes") that resulted in the seizure of $239,400. On February 11, 2011, at approximately 1:30 pm, DEA Special Agent Robert Glynn ("SA Glynn") and DEA Task Force

Officers ("TFOs") Dennis Ivanich, Robert Schaller and Michael Tucker, all dressed in plainclothes, went to the first class lounge with the intention of making contact with Valdes, who was laid over in Chicago for five hours on a cross country trip from Boston, Massachusetts to Los Angeles, California. Valdes' travel itinerary had been flagged as suspicious during a passenger manifest screen because he had a one-way ticket for a private sleeper car that was purchased via a credit card issued to another individual, George Brown, shortly before the train's scheduled departure time for $824.00. These characteristics–the lack of a return ticket, the last minute purchase in someone else's name, the high price paid, and the private sleeper car–fit the profile of a drug courier, and the officers were seeking to investigate further.[1]

The stories diverge over what transpired once the officers reached the first class lounge. I lay out Valdes' version first, followed by TFOs Ivanich and Schaller's.

   A.   The Facts According to Valdes

At 1:30 pm, Valdes was seated in the far right corner of the first class lounge with three pieces of luggage. He was chatting with a couple seated next to him when he received a page over the loudspeaker telling him to come to the reception desk. Valdes asked the couple to watch his bags for him while he responded to the page. When he got to the reception desk, he was directed to the officers who were standing ten to fifteen away from the front door. One of the officers identified himself as a DEA agent and showed Valdes his badge. At this point, Valdes says that 3 to 4 officers were standing "all around" him, and Valdes claims he noticed what he thought to be a revolver on the hip of the officer who identified himself.

---

[1]The parties dispute when the ticket was actually purchased. While the government's position appears to be that the ticket was purchased approximately 24 hours before Mr. Valdes embarked from Boston, there is some evidence to suggest it was closer to 48 hours.

The officer who identified himself told Valdes that he was not under arrest and was not in trouble, but did not tell him that he was free to leave. The officer asked Valdes where his luggage was, and Valdes told him that it was at the back of the lounge where he had been sitting. The officer then told Valdes that he had to take them to his luggage, and he did. When they got to the luggage the officer asked Valdes if he had any drugs in his luggage. Valdes responded "no." The officer then asked if he had any money in his luggage and Valdes said that he did. When the officers asked how much, Valdes said "a lot."

The officers then told Valdes they needed to speak with him about the money and they were going to take him somewhere, but did not specify where. Valdes agreed to accompany them and reached for his luggage, at which point one of the officers stood in between Valdes and his luggage and said "you can't touch that." One of the officers grabbed the luggage and Valdes was led out of the lounge over to an elevator roughly a hundred feet away in the main lobby. Valdes and the officers boarded the elevator and took it down to a secure area in the basement where the Interdiction Task Force had offices.

Once in the basement, Valdes was led into a small room with a bench, a desk, and a two-way mirror. He was told to sit on the bench and his luggage was placed in the hallway just outside the doorway of the room, so that it was still visible to him. Valdes claims the officers proceeded to search his suitcase in the hallway without his consent: "They got my suitcase. They throw them on the floor, they then unzipped a liner compartment and they saw four packages and they partially opened one and said, oh, okay there's money here . . ." (Transcript of 3/14/2012 evidentiary hearing, p. 27).

After the bag containing the money had been searched, the officers presented Valdes with several documents that they asked him to read and sign. The first was a "Consent to Search" form, which Mr. Valdes claims had not been filled in to indicate the items to be searched or the date. After being asked to sign the consent form, Mr. Valdes stated to the officer, "this is telling me that I told you that it was okay for you to go to my bag and I gave you permission and I didn't . . . you already opened my bags, it's already opened, so why am I going to give you consent to something that you've already done?" (Transcript of 3/14/2012 evidentiary hearing, p. 32). An argument apparently ensued but was interrupted by a bizarre turn in the conversation when the officer asked Mr. Valdes if he liked Boston sports teams. Mr. Valdes believes this was an attempt to calm him down and get him to sign the form. It was unsuccessful. Mr. Valdes continued to refuse to sign the consent form, at which point the officer told Mr. Valdes if he did not sign the form the officers would forge his signature and say that he had signed the form. That "bothered" Mr. Valdes at "a very high level," and he persisted in his refusal to sign the form.

The "Consent to Search" form as admitted into evidence by both parties (Government Exhibit No. 7; Claimant Exhibit Letter A) lists three items to be searched: "1 Gray 'Apt. 9' Roller Suitcase; 1 Gray 'Apt. 9' Handbag; 1 Green 'High Sierra' handbag." Below the list appears two statements: "I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY"; and "I FREELY CONSENT TO THIS SEARCH." Below these statements are a signature and date line, and below that are two lines for witness signatures. The form is dated "2-11-11 " and a mark appears on the signature line that closely resembles signatures that Valdes admits are his own that appear on other documents in evidence. The two witness lines are also signed, apparently by TFO Ivanich and TFO Schaller.

Next Mr. Valdes was given an "Advice of Rights" form. The top of the form read "BEFORE WE ASK YOU ANY QUESTIONS, DO YOU UNDERSTAND:", and below it the basic *Miranda* warnings were listed. Next to each warning was a blank line to be signed or initialed. Valdes initialed all five lines to indicate that he had read and understood his rights. Below the list of rights was a "WAIVER OF RIGHTS" section which stated "[ ] I have read or [ ] someone has read to me this advice of rights and I understand what my rights are. I am willing to freely and voluntarily answer questions without a lawyer present." The two boxes indicating whether the signor had himself read the form or someone else had read it to him were left blank. Below this is a signature line and two witness lines. Valdes claims that, after initialing the form five times to indicate that he understood his rights, he refused to sign the form to indicate waiver of these rights. The "Advice of Rights" form admitted into evidence (Government Exhibit No.8; Claimant Exhibit Letter B) contains a mark on the signature line that closely resembles the signature that appears on the "Consent to Search" form. The two witness lines are also signed, apparently by TFO Ivanich and TFO Schaller.[2]

After refusing to sign the "Consent to Search" and "Advice of Rights" forms, Valdes received a phone call from his wife. When he answered the phone, the officers told him that he could not touch his phone so Valdes told his wife he had to call her back and hung up the phone. Valdes was then fingerprinted, photographed, and had his drivers license information taken down by one of the officers. Valdes then asked the officers whether he would be able to catch his train.

---

[2] Valdes testified that he next signed a form claiming ownership of the currency found in his luggage, but neither side has produced the alleged form.

He was told that he was allowed to leave and would be escorted back upstairs to the passenger lounge by one of the officers.

On the way out of the room, one of the officers asked Valdes who he was going to see. Valdes told the officer he was going to see "Sam." The officer asked him "Sam who?" and Valdes told him "Sam Vongphakdy" and spelled his name. Valdes explained that he bought a lot of computer equipment from Mr. Vongphakdy and offered to show the officers emails on his phone pertaining to the sale of such equipment. One of the officers asked Valdes to tell them more about Mr. Vangphakdy, but Valdes refused because he was upset about one of the officer's earlier comments that they would forge his signature if he refused to sign the forms. Valdes was allowed to take his luggage but the money was seized. He was then escorted back upstairs and the encounter was terminated. Mr. Valdes estimates that the entire encounter, from first contact in the first class lounge until he was escorted back upstairs, lasted between one and a half to two hours.

  B. <u>The Facts According to the Government</u>

The Government tells a different story. According to the testimony of TFOs Ivanich and Schaller the events of February 11, 2011 transpired as follows: At approximately 1:30 pm TFOs Ivanich, Schaller, Tucker and SA Glynn went to the first class lounge to try to locate Mr. Valdes. Neither officer recalls paging Mr. Valdes. TFO Ivanich testified they found him by "scann[ing] the first class lounge looking for a male subject who we thought might be [him]." (Transcript of 3/14/2012 evidentiary hearing, p. 144). Once they spotted an individual they thought could be Mr. Valdes, TFOs Ivanich and Schaller approached while TFO Tucker and SA Glynn stayed approximately 20 feet behind close to the entranceway.

6

TFOs Ivanich and Schaller walked up to Mr. Valdes, who was sitting alone, identified themselves by telling him they were with the DEA and showing him their credentials, and asked if they could speak with him. TFO Ivanich told Mr. Valdes that he was not under arrest, was not in trouble, and did not have to speak with them. Mr. Valdes agreed to speak with them. TFO Ivanich asked to see photo identification and his train ticket. Mr. Valdes complied, handing TFO Ivanich his train ticket and a New Hampshire driver's license. TFO Ivanich verified that the person on the identification matched the individual standing before him and then returned the ticket and driver's license to Mr. Valdes.

During this portion of the encounter TFO Ivanich was standing two to three feet off to Mr. Valdes' right, and TFO Schaller stood the same distance off to his left. Neither officer displayed weapons or handcuffs. TFO Ivanich used a "monotone and calm" tone of voice, and did not command or threaten Mr. Valdes. TFO Ivanich testified that Mr. Valdes was "calm and compliant" throughout this initial encounter.

After returning his ticket and driver's license, TFO Ivanich asked Mr. Valdes his purpose of travel. Mr. Valdes stated that he owned a recycling business and he was going out to California for a few days. He also stated that he was going to fly back to Boston at the end of his trip. TFO Ivanich then asked Mr. Valdes if he was carrying any type of weapons, illegal drugs or large amounts of United States currency. Mr. Valdes replied that he had about $200,000 in his suitcase. TFO Ivanich asked him why he was carrying so much cash, and Mr. Valdes replied that he was going to use it to purchase computers to recycle.

TFO Ivanich then asked Mr. Valdes for consent to search his luggage in the lounge. Mr. Valdes gave verbal consent without hesitation. TFO Ivanich asked him which suitcase contained

7

the money, and Mr. Valdes pointed to his gray roller suitcase. TFO Schaller proceeded to search the gray roller suitcase while Mr. Valdes stood by silently and watched. TFO Schaller found four small packages wrapped with brown paper bags at the bottom of the suitcase. Mr. Valdes stated that the money was in the packages. TFO Schaller then peeled back part of the wrapping and verified that there was United States currency inside.

From the small opening that TFO Schaller had made in one of the packages, TFO Ivanich could see there were at least two layers of packaging wrapped around the money. TFO Ivanich asked Mr. Valdes if he had packaged the money like that, and Valdes stated that he had. TFO Ivanich asked Mr. Valdes if he had recently taken the money out of the bank. Mr. Valdes told him no, that he had been keeping the money at his home for some time. TFO Ivanich then asked Mr. Valdes if he had any receipts for the money, and Mr. Valdes told him no.

TFO Ivanich then asked Mr. Valdes who he was going to see in California, and Mr. Valdes told him "Sam." TFO Ivanich asked Mr. Valdes if he had a phone number, address, or any other way to contact Sam, and Mr. Valdes stated that he did not. TFO Ivanich asked Mr. Valdes how he was going to contact Sam once he arrived in California and Mr. Valdes did not respond.

At this point TFO Ivanich made the decision to detain the money for further investigation. TFO Ivanich told Mr. Valdes that he was going to detain the money and that Mr. Valdes was free to leave but could accompany the officers back to their office to get a receipt for the money. Mr. Valdes stated that he would go with the officers. Carrying his own luggage, Mr. Valdes left the room with TFOs Ivanich, Schaller and at least one of the other officers. TFO Ivanich did not

recall specifically but believes they took the elevator down to the basement, as that was standard procedure when bringing a traveler with luggage down to the office.

When they arrived at the DEA office in the basement of Union Station, Mr. Valdes went into one of the offices with his luggage. TFO Ivanich photographed the packages of money inside the suitcase, then removed the packages from the suitcase and laid them out on the floor of the office to be photographed, then returned them to the suitcase for the sniff test. During the photographing of the packages, TFO Ivanich noticed that the currency was packaged in three different layers–an outer layer of cardboard paper, a middle layer of plastic saran wrap, and an inner layer of tin-foil. Mr. Valdes was seated a few feet away while the packages were being photographed.

When TFO Ivanich had the currency laid out on the floor, Mr. Valdes stated that he might have about $240,000, as opposed to the initial figure of $200,000 that he told the officers in the lounge. TFO Ivanich asked him who had purchased Mr. Valdes' train ticket for him, and Mr. Valdes stated that he did not know. TFO Ivanich then asked him who George Brown was, and Mr. Valdes stated that George Brown was his father-in-law. Mr. Valdes stated that George Brown may have purchased his ticket but he was not sure.

TFO Ivanich then presented Mr. Valdes with a series of forms. First, was an "Address Acknowledgment" form, which Mr. Valdes filled in and signed. The purpose of this form was to obtain a good address for Mr. Valdes where the government could send information on the asset forfeiture process. Second, was a "Disclaimer of Ownership" form which allows the signer to disclaim "any and all interests in the currency sought to be forfeited." Mr. Valdes refused to sign this form, meaning that he was claiming the money.

9

Third, was the "Consent to Search" form, upon which TFO Ivanich had listed the three pieces of luggage to be searched. TFO Ivanich explained to Mr. Valdes that by signing the "Consent to Search" form he was reaffirming the consent to search his luggage that he had verbally given the officers in the first class lounge. Mr. Valdes signed this form. TFO Ivanich denies ever telling Mr. Valdes that if he did not sign the form, they would forge his signature.

Fourth, Mr. Valdes was presented with the "Advice of Rights" form. Mr. Valdes initialed next to all of the rights and then signed the form under the "WAIVER OF RIGHTS" section. However, TFO Ivanich testified that Mr. Valdes did not intend to waive his rights. Apparently, TFO Ivanich told Mr. Valdes that by signing the form he was merely acknowledging that he knew and understood his rights, but was not waiving them.

Finally, Mr. Valdes was given a "Receipt For Cash or Other Items" form that had been filled in by TFO Ivanich. The receipt states that the DEA seized four bundles of an unknown amount of United States currency for further investigation. Across the center of the form a diagonal line with an "x" is drawn in. Mr. Valdes signed on this line. Below this signature line is a "Received By" line signed by TFO Ivanich, and a "Witnessed By" line signed by TFO Schaller.

After signing the receipt form, Mr. Valdes was allowed to leave. TFO Ivanich estimates the entire encounter lasted between 30 to 45 minutes.

## II. ANALYSIS

### A. Threshold Legal Issues

Before sorting through the conflicting facts, I pause to address a few threshold legal questions. First, it is not clear that the exclusionary rule even applies to this case. The Supreme Court has suggested that, barring "egregious" Fourth Amendment violations, the exclusionary

10

rule does not apply in civil proceedings. *See Krasilych v. Holder*, 583 F.3d 962, 967 (7th Cir. 2009) (*citing INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050-51 (1984)). The primary purpose of the exclusionary rule is to deter unlawful police conduct. Courts have generally held that application of the exclusionary rule to criminal trials alone creates an adequate deterrent; any marginal benefit gained by extending the exclusionary rule to civil proceedings tends to be outweighed by the social cost of losing probative evidence. *See generally United States v. Janis*, 428 U.S. 433 (1976).

The exclusionary rule seems particularly ill-suited to civil forfeiture proceedings, where it is a physical object, not a person, that is the defendant. As Judge Easterbrook aptly put it in a recent opinion, "[s]uppressing the *res* in a civil proceeding . . . would be like dismissing the indictment in a criminal proceeding whenever the defendant was arrested without probable cause." *U.S. v. Marrocco*, 578 F.3d 627, 642 (7th Cir. 2009) (Easterbrook, J. concurring). In the criminal context, dismissing an indictment because of an illegal arrest clearly gets the *Janis* balancing test wrong; the social costs of allowing defendants to get off scot-free whenever law enforcement screws up are unacceptably high. It seems to follow that excluding the *res* in civil forfeiture proceedings is an equally disproportionate response.

Nevertheless, *Marrocco* indicates that the Seventh Circuit is awaiting a clearer signal from the Supreme Court before barring exclusionary-rule based motions to suppress in civil forfeiture cases. As in *Marrocco*, the Government has not questioned the use of the exclusionary rule in this case, so I will reach the merits of the Fourth Amendment challenge. *Id*. at 643.

Second, much of Mr. Valdes' argument centers around the question of whether he waived his *Miranda* warnings. This is largely irrelevant. The Fifth Amendment's Self-Incrimination Clause is not implicated in this case because 1) the Government is not using any of Mr. Valdes'

11

statements against him in a criminal trial, *see U.S. v. Patane*, 542 U.S. 630, 641 (2004) ("Potential [*Miranda*] violations occur, if at all, only upon the admission of unwarned statements into evidence at trial."); and 2) failure to give *Miranda* warnings does not require suppression of the physical fruits of a suspect's unwarned but voluntary statements. *Id*.

There are really only three questions raised in this case. First, did Valdes give consent to search his luggage? Second, if so, was the consent valid–i.e. voluntary *and* not the fruit of prior illegality by law enforcement? *See generally* W. LaFave, Search and Seizure § 8.2(d) (3d Ed. 1996). Third, if the consent was voluntary, at the time the search was completed was it reasonable for the officers to detain the luggage for further investigation? If the answer to any of these questions is "no," I must grant the motion to suppress.

B.     Credibility Determination

The answers to these questions turn on whose version of the facts I accept. While neither side's story is without some holes, that is not unusual given that more than a year has passed since the events in question. Ultimately, I find Mr. Valdes' testimony on a number of key issues to be not credible and as a result I reject his version of events and accept the material facts as offered by the Government.

Mr. Valdes' testimony was not credible for a number of reasons. First, his explanation of why he wrapped the currency in three layers consisting of tinfoil, Saran wrap, and cardboard paper makes no sense. He claims that he wrapped the money this way "so that it would not be recognizable at first or second glance" to Amtrak employees or others who might be handling his baggage (Transcript of 3/14/2012 evidentiary hearing, p. 85). But wrapping the money in one layer of cardboard paper would do just as much to hide the contents–why the extra two layers?

And, even harder to explain, what does Saran wrap–a completely transparent material–add to an effort to visually conceal something?

Second, I believe that Mr. Valdes signed all of the documents at issue in this case, and I do not believe that anyone threatened to forge his signature if he refused to sign. The signatures that appear on the "Consent to Search" and "Advice of Rights" forms closely resemble the signatures on the claim verification form that Mr. Valdes filed in his Massachusetts seizure case (Gov. Exhibit 17), as well as the signature on the receipt, both of which Mr. Valdes admits are his own. I find TFO Ivanich's testimony on the signing of the forms to be especially credible given his admission that even though Valdes signed the "Advice of Rights" form he did not intend to waive his rights. Why would someone go through the trouble of forging a signature and then turn around and fabricate a story that renders the signature legally ineffectual?

Third, Mr. Valdes' explanation of why his ticket was purchased with his father-in-law's credit card is not credible. Mr. Valdes testified that his father-in-law purchased the $824 train ticket to pay Mr. Valdes back for an iPad that he bought for his father-in-law through a credit card rewards point program. Claimant's own attorney inadvertently revealed why this explanation makes no sense–why would the father-in-law pay Mr. Valdes back for a *gift* that Mr. Valdes essentially got for *free*?

Fourth, Mr. Valdes was evasive and noticeably agitated on the witness stand when asked about the July 26, 2011 seizure of $278,000 from the back of a pickup car he was driving in Massachusetts. I do not believe Mr. Valdes' testimony that he did not know the money was in the back of his truck. His credibility took a further hit when, asked whether he filed a claim for that money, he responded "not to my knowledge." (Transcript of 3/14/2012 evidentiary hearing,

p. 91). In fact, Mr. Valdes had filed a claim for the money on September 28, 2011, less than six months prior to his testimony in this case.

Finally, Mr. Valdes' time-frame does not add up. He admits that the encounter began around 1:30 pm and estimates that it lasted between one and a half to two hours. If this were so, the earliest he would have gotten out was 3 pm, fifteen minutes after his train was scheduled to depart. Yet Mr. Valdes testified that at the end of the interview he still thought he could catch his train. In fact, he had time to make it back up to the passenger lounge and "contemplate" whether it was still worth taking the trip. This would only be possible if the train were delayed, which there is no evidence of, or the encounter lasted roughly 45 minutes, as the Government contends.

By contrast, I found the testimony of both TFO Ivanich and TFO Schaller to be highly credible. Their facts were reasonably (as opposed to suspiciously) consistent and stood up against cross examination. Both officers admitted potentially unfavorable facts–they never told Mr. Valdes he was free to leave, they only received verbal consent to search once, Mr. Valdes did not intend to waive his *Miranda* rights, for example. Both officers were calm on the witness stand and were unfazed by Defense counsel's suggestions of impropriety. They gave clear answers to questions and admitted without equivocation when they could not recall certain details.[3]

---

[3] Claimant focuses a great deal of energy arguing that the agents had him paged over the intercom and did not approach him in the lounge. TFOs Ivanich and Schaller stated they did not recall doing that but did not foreclose the possibility. Even assuming Valdes was paged, this does not tip the totality of the circumstances in his favor.

C. <u>Reasonableness of the Seizure</u>

Accepting the Government's version of the facts, I find that Mr. Valdes gave TFOs Ivanich and Schaller verbal consent to search his luggage in the first class passenger lounge. I also find that the consent was voluntary. The totality of the circumstances indicate that Mr. Valdes was not subject to duress or coercion at any time during the encounter. He was told that he was not under arrest, was not in trouble and did not have to speak with the officers if he did not want to; no weapons were displayed or other threats of force made; TFO Ivanich used a calm, non-commanding tone of voice; nobody touched Mr. Valdes; both TFO Ivanich and Schaller stood two to three feet away from Mr. Valdes; TFO Ivanich only asked once for consent to search the bag and Mr. Valdes did not hesitate in granting consent; the search took place in an open, public area; Mr. Valdes appeared calm and compliant throughout the encounter; and no more than ten minutes passed between the first contact and the search.

Nor was the voluntary consent the fruit of an unlawful seizure or any other form of illegality on the Government's part. Mr. Valdes was not seized at any point preceding the search "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, [or] by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen . . ." *Florida v. Royer*, 460 U.S. 491, 497 (1983). Unlike *Royer*, the officers in this case immediately returned Mr. Valdes' identification and train ticket after verifying the information, did not seize or have possession of his luggage prior to the search, did not tell Mr. Valdes he was suspected of drug trafficking (to the contrary, he was explicitly told he was not in trouble), and did not ask him to accompany them to the DEA office until *after* the search had been conducted in a public area. Although the officers do not appear to have told Mr. Valdes that he was free to decline the

search, he had been told that he did not have to talk with them just a few minutes prior. The totality of the circumstances places this case closer to *U.S. v. Mendenhall*, 446 U.S. 544 (1980) than to *Royer*.[4]

After receiving valid consent and conducting the search, two questions arise. First, did the officers then have "specific, articulable facts which, judged in light of the officers' experience, [justified]" the detention of Mr. Valdes' luggage? *United States v. Yang*, 286 F.3d 940, 949 (7th Cir. 2002). Second, was the detention of the baggage "reasonable in time and scope given the totality of the circumstances surrounding the investigatory act"? *Id*. I find that the answer to both of these questions is "yes."

Once the officers saw that the money was wrapped in at least two different layers of material, and considering Valdes' inability to answer basic questions about his travel plans and the characteristics of his itinerary, the officers had reasonable suspicion (if not probable cause) to detain his luggage. As TFO Ivanich testified, based on his experience he knew that the way Valdes had wrapped the money was "a common way drug couriers, money couriers, package the money to avoid detection of drug dogs" by throwing off the scent. (Transcript of March 14, 2012 Evidentiary Hearing, p. 164). It is difficult to imagine any innocent purpose for packaging money in such a manner, and thus the incriminating nature of the packaging was sufficiently apparent to seize it on the spot. That distinguishes this case from the plastic bag in *Moya v.*

---

[4]Although Mr. Valdes does not appear to have received clear instruction that he could refuse consent to search his luggage, the fact that he was not taken to the DEA office until after the search took place makes the voluntariness of his consent, in the court's opinion, firmer than in *Mendenhall*.

16

*United States*, 761 F.2d 322 (7th Cir. 1984), and brings it closer to the tied-off balloon in *Texas v. Brown*, 460 U.S. 730 (1983).[5]

Finally, I find the length of the officers' detention of the luggage to be reasonable under the circumstances. The luggage was detained for no longer than 40 minutes, and it was given back to Mr. Valdes in time for him to catch his train. The officers did not have adequate suspicion to arrange for a sniff test before the encounter with Mr. Valdes in the first class lounge, and as soon as they did have reasonable suspicion they promptly arranged and conducted the test. *See Maracco*, 578 F.3d 627 (2009). The seizure lasted no longer than necessary to conduct the sniff test, photograph the packages of currency, and have Mr. Valdes fill out the "Consent to Search" and other forms. The seizure of the luggage was therefore reasonable in time and scope given the substantial evidence the officers had that the currency was tied to drugs.

Whether Mr. Valdes himself was seized after the consensual search took place in the first class lounge is not relevant to this proceeding and I do not reach the question. The earliest point at which he could plausibly have been seized was immediately after the consensual search when the officers told him they were taking his luggage to the DEA office for further investigation and that he could accompany them if he wanted. But at this point, the officers had already obtained valid consent to search his luggage and had all the reasonable suspicion they needed to proceed with the sniff test. Therefore any unlawful seizure of Valdes himself would not effect the motion

---

[5]For doctrinal clarity, it is important to note that *Moya* and *Brown* are cases concerning the plain view exception to the warrant clause, not the consent exception. There is little doubt in the court's mind that if, in *Moya*, the officers had asked during a consensual encounter if Moya was carrying drug paraphernalia, Moya said "yes," and the officers obtained valid consent to search his luggage and *then* seized the plastic bag, the Seventh Circuit would not have upheld a suppression order.

to suppress one way or the other. If he wishes to pursue the matter, Mr. Valdes is free to bring a civil damages action for unlawful arrest.

Similarly, I need not dig further into the facts of what exactly took place in the DEA office. While I believe Valdes signed the "Consent to Search" form, his written consent is not necessary to uphold the validity of the search. Even if he changed his mind about consenting to the search when he got downstairs, it does not unring the bell of valid verbal consent to search he gave in the lounge or undermine the reasonable suspicion derived therefrom. Nor does it matter whether he signed the "Advice of Rights" form. I believe he did, but based on TFO Ivanich's testimony I cannot accept that as a knowing and intelligent waiver of his *Miranda* rights. But again, it does not matter–no statements that Mr. Valdes made during the period when he was possibly in custody are being used against him. The testimony as to what took place after the consensual search in the passenger lounge was useful for assessing witness credibility, but it does not impact the legality of the seizure.

### III. CONCLUSION

For the foregoing reasons, the motion to suppress is denied. The question of who this money belongs to remains; Claimant must determine whether, in light of this ruling, he will continue to assert ownership.

ENTER:

James B. Zagel
United States District Judge

DATE: June 5, 2012